MUNICIPAL CAPITAL APPRECIA-
TION PARTNERS I, L.P., a limited
partnership, and Municipal Capital
Appreciation Partners II, L.P., a limit-
ed partnership, Plaintiffs,

v.

J. David PAGE, Southport Financial
Services, Inc. and Vaughn Bay
Construction Inc., Defendants.

No. 00 Civ. 8138(CM)(LMS).

United States District Court,
S.D. New York.

Jan. 16, 2002.

Joseph F. Donley, Nicolle L. Jacoby, Swidler, Berlin, Shereff, Friedman, LLP, New York City, for plaintiffs.

Gerald G. Paul, Christina M. Rackett, Flemming, Zulack & Williamson, LLP, New York City, for defendants.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Municipal Capital Appreciation Partners I, L.P. and Municipal Capital Appreciation Partners II, L.P. (collectively, "plaintiffs" or "MCAP"), bring this diversity action under 28 U.S.C. § 1332 against J. David Page, Southport Financial Services, Inc., and Vaughn Bay Construction, Inc. (collectively, the "Page defendants"). MCAP alleges that the Page defendants are liable for breaching various contracts that required them to purchase municipal bonds issued in connection with several housing projects from MCAP at specified prices. MCAP alleges that the Page Defendants failed to purchase such bonds on the timetable or at the price agreed by the parties, and are jointly and severally liable to MCAP for these breaches.

MCAP moves for summary judgment pursuant to Fed.R.Civ.P. 56(c). MCAP also requests that the case be referred to a Magistrate or special master for a determination of damages.

For the reasons stated below, MCAP's motion for summary judgment is granted in part and denied in part. As not all issues have been determined on motion, reference to a Magistrate is denied as premature.

## FACTS PERTINENT TO THE MOTION

MCAP is a limited partnership that invests the contributions of its partners. MCAP invests primarily in securities. It focuses its investments on unrated municipal bonds issued in connection with real estate projects and related financial instruments. Defendant J. David Page is President of Southport Financial Services, Inc., and is in the business of developing and managing real estate projects throughout the United States. Paul Garcia, who passed away on May 27, 2000, was one of Page's partners. Garcia managed the day-to-day operations of the Page defendants' California-based projects, including those at issue in this case.[1]

Between 1998 and the present, MCAP and the Page defendants entered into several agreements involving unrated municipal bonds issued to finance low-income housing projects. Four sets of these bonds are at issue here: the Stockton Terrace Bonds, the Stockton Gardens Bonds, the Susanville Bonds and the Sampson Bonds.[2]

### A. The Stockton Terrace and Stockton Gardens Bonds

#### (1) Issue and Purchase of the Stockton Bonds

In 1998, J. David Page and Paul Garcia acquired two apartment projects in Stock-

---

1. The estate of the late Mr. Garcia, and his wife, Susan Garcia, were released from all related litigation by agreement of the parties on October 6, 2000, and are not parties to this action.

2. MCAP's Amended Complaint alleges that the Page defendants owed a 4% penalty on the 110% of principal (plus accrued interest) paid on another set of bonds called the Sunset Bonds. The Page defendants recently paid this penalty, and the Sunset Bonds claim was voluntarily dismissed. [Pl. Reply Mem., p. 10].

ton, California: the Stockton Terrace and the Stockton Gardens projects. Tax exempt bonds were issued in connection with these projects in the spring of 1998 (the "Stockton Terrace Bonds" and the "Stockton Gardens Bonds," collectively the "Stockton Bonds").

The initial Stockton Bonds transactions generated two sets of documents: (1) the Indentures of Trust between the issuer of the Stockton Bonds, the California Statewide Communities Development Authority (the "Issuer"), and the trustees of the Bonds, U.S. Bank Trust National Association (the "Trustee") (the "Indentures"); and (2) separate but parallel Loan Agreements among the Issuer, the Trustee and a limited partnership formed by Page, Paul Garcia and Sue Garcia (GP Stockton Terrace L.P. or GP Stockton Gardens L.P., respectively) (the "Borrowers") (the "Loan Agreements"). MCAP was not a party to either the Indentures of Trust or the Loan Agreements.

Several provisions of these documents are invoked by the parties in this litigation, and warrant discussion herein.

### a. The Indentures

Section 7.01 of the Indentures describe what constitutes an event of default, as follows:

(a) failure to pay the principal and Accreted Value of or premium (if any) on any Bond when and as the same shall become due and payable, whether at maturity as therein expressed, by proceedings for redemption, by declaration or otherwise;

(b) failure to pay any installment of interest on any Bond when such interest installment shall become due and payable; and

(C) failure by the Issuer or the Borrower to perform or observe any other of the covenants, agreements or conditions

on its part in this Indenture, the Loan Agreement or in the Bonds contained, and the continuation of such failure for a period of thirty (30) days after written notice thereof, specifying such default and requiring the same to be remedied, shall have been given to the Issuer and the Borrower by the Trustee, or to the Issuer and the Trustee by the holders of a majority in aggregate principal amount of the Bonds at the time outstanding.

Section 7.01 gives the Trustee the authority to declare an acceleration. If such a declaration is to be made, the Trustee "shall, by notice in writing to the Issuer and the Borrower declare the principal or Accreted Value of all the Bonds then outstanding, and the interest accrued thereon, to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in this Indenture or in the Bonds contained to the contrary notwithstanding. Upon any such declaration of acceleration, the Trustee shall fix a date for payment of the Bonds, which date shall be as soon as practicable after such declaration." *Id.*

### b. The Loan Agreements

The Loan Agreements also provide conditions under which an Event of Default may occur, as follows:

(b) failure by the Borrower to pay any amounts required to be paid under Section 4.2 hereof at the times specified therein and such failure continues for a period of sixty (60) days from the first date on which such failure occurred;

\* \* \* \*

(d) failure by the Borrower to observe and perform the covenants, conditions and agreements on its part required to be observed or performed contained in

Sections 2.4 and the first paragraph of Section 5.4 of this Agreement, unless the Issuer and the Majority Holder shall agree in writing to provide an extension of such time prior to its expiration.

Loan Agreements, Section 7.1(a) and (d). Section 7.2 of the Loan Agreements provides for the remedies available after a default has occurred. One of the possible remedies provides:

> Whenever any Event of Default shall have occurred and shall continue, the Issuer and the Trustee may take any one or more of the following remedial steps:
>
> (a) Notwithstanding any other provisions of this Indenture, the Trustee shall upon the occurrence of an Event of Default hereunder, unless the Trustee's obligation to commence foreclosure proceedings under the Deed of Trust is properly waived pursuant to the provisions of Section 7.1 hereof, *declare to be due and payable immediately the unpaid balance of the Loan;* and in the event of such occurrence shall commence foreclosure proceedings under the Deed of Trust.

Loan Agreements, Section 7.2(a) (emphasis added). After an Event of Default has been declared, and remedies under the default sought, the Trustee or the Issuer may discontinue or abandon the default proceedings. If this occurs, Section 7.2 provides:

> In case the Trustee or Issuer shall have proceeded to enforce its rights under this Agreement and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee or the Issuer, then, and in every such case, *the Borrower, the Trustee and the Issuer shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Borrower, the Trustee and the Issuer shall continue as though no such action had been taken.*

Loan Agreements, Section 7.2 (emphasis added). The Loan Agreements contain no provisions for 10% default premiums on the Stockton Bonds.

### (2) MCAP's Purchase of the Stockton Bonds and the Put Agreements

In the Spring of 1998, MCAP purchased the Stockton Bonds from the Page defendants. On July 20, 1998, following MCAP's purchase of the Stockton Bonds, MCAP and the Page defendants entered into two virtually identical put agreements relating to the Stockton Terrace and Stockton Gardens Bonds. These agreements (the "Put Agreements"), gave MCAP the right to require the Page parties to purchase the Stockton Bonds under specific terms and conditions. Paragraph 2.1 of each Put Agreement provides as follows:

> From and after the Closing Date of the Bonds and until the thirty-fifth (35th) day following the second anniversary of the Closing Date on the Bonds, MCAP shall have the right, in its sole and absolute discretion to sell, upon thirty (30) days prior written demand, to the Guarantors, the Bonds, *at a purchase price equal to the Principal Amount thereof then outstanding and all interest (if any) then due and payable on the bonds* (the "Put") unless prior to such Put Date a "Conversion" (hereinafter defined) shall have occurred. MCAP's Put rights shall be unconditional and shall exist even if the Conversion failed to occur by reason of any of the conditions to Conversion set forth in the Forward Commitment. By their execution of this Agreement, the Guarantors hereby unconditionally, jointly and severally agree to accept the Put, to pay the purchase

price thereof upon proper demand hereunder, and waive all notice, demand, protest, notice of acceptance and any and all similar notices and demands given or required now or hereafter by statute or rule of law, including discharge by reason of any modification by act, omission, or agreement of the terms of the Bonds, Borrower Loan Documents or Forward Commitment. The Guarantors further waive any exemptions of real or personal property from execution or inquisition under any existing or future law in connection with any enforcement of the Put. (Emphasis added.)

The Put Agreements provide for a purchase price "equal to the Principal Amount thereof then outstanding and all interest (if any) then due and payable on the bonds." There is no provision in the Put Agreements concerning payment of a 10% premium or penalty. There is also no provision in the Put Agreement that expressly incorporates the terms of the Indentures or the Loan Agreements.

### (3) The Put

On June 16, 2000, within the timetable provided for in the Put Agreements, MCAP gave the Page defendants one month's notice of its intent to exercise its rights under the Stockton Bonds Put Agreements. At this time, the Stockton Bonds were in default for failure to pay principal and interest previously due to MCAP.

### (4) The Event of Default

On June 30, 2000, the Trustee under the Indentures sent a Notice of Event of Default letter on each of the Stockton Bonds to GP Stockton Gardens L.P. and GP Stockton Terrace L.P. (the "Borrowers") These letters were copied to various other persons and companies, including MCAP. In these Notices of Events of Default, the Trustee notified the Borrowers that they

had failed to perform covenants under both the Loan Agreements and the Indentures, that these failures constituted "Events of Default" under these documents, and that payments would be accelerated. The letter notices did not invoke Section 7.12 of the Indentures that provides for a mandatory redemption in the event of a default. The letter notices cited specific defaults under both the Loan Agreements and the Indentures.

### a. Defaults under the Loan Agreements

The Trustee notified the Borrowers that they (i) failed to make monthly payments on the Bonds to the Trustee as required by Section 4.2(a) of the Loan Agreements, and by Section 5.02(b) of the Indentures, and that such failure had continued for over sixty (60) days; and (ii) failed to "provide evidence of insurance required by the first paragraph of Section 5.4". These failures constituted the occurrence of an "Event of Default" under Sections 7.1(b) and 7.1(d) of the Loan Agreement. Pursuant to Section 7.2(a), the Trustee declared "the unpaid balance of the Loan to be due and payable immediately." The Trustee also notified Borrower of its failure to perform covenants with respect to providing financial statements, budgets and other information. The Trustee demanded that the above failures and defaults be cured and corrected immediately.

### b. Defaults under the Indentures

The Trustee also noted that "the interest payment due on June 15, 2000, on the Bonds was not made timely," and that "constitute[d] an "event of Default" under Section 7.01(b) of the Indenture[s]." Pursuant to Section 7.01 of the Indentures, the Trustee declared the "principal or Accreted Value (as defined in the Indenture) of all outstanding Bonds, and the interest

accrued and unpaid thereon, to be due and payable immediately, and (b) fixe[d] July 10, 2000, as the date for payment of the Bonds."

The Page defendants concede that, "at the time MCAP exercised its rights under the put agreements, the Stockton Bonds were in default." [Page Aff., ¶ 8; *see also* Def. Opp. to Summary Judgment, p. 2.]

(5) *The July 14 Settlement Agreement*

On July 14, 2000, before payment was due on the Stockton Bonds pursuant to the Put (but after payment was due pursuant to the Notices of Events of Default), the parties negotiated a global settlement of six different transactions, including the Stockton Bonds (the "July 14 Agreement"). The July 14 Agreement makes no reference to the existence of any default, acceleration or mandatory redemption under the Loan Agreements or Indentures. In fact, the July 14 Agreement makes no reference at all to either the Indentures or the Loan Agreements.

The July 14 Agreement deferred the date of payment of the put for the Stockton Bonds to August 1, 2000, as follows:

> 4. *Stockton Terrace* CSCDA Multifamily Housing Revenue Bonds
>
> (Stockton Terrace Apartments) 1998 Series T (the "Stockton Terrace Bonds").
>
> a. The Page Parties will pay the Put price for the Stockton Bonds pursuant to the Put Agreement dated as of July 20, 1998 pertaining to the Stockton Terrace Bonds on or prior to August 1, 2000 *at the Put prices stated therein (i.e., 110%),* provided that unless an event of default occurs on or after the date hereof (and excluding the continuance of the defaults detailed in MCAP's letter to the bond trustee on June 19, 2000) no additional late payments or default interest shall be due. (Emphasis added.)

The following section of the July 14 Agreement, which addresses the Stockton Gardens Bonds, contains the identical provisions. No reference was made in the July 14 Agreement to any prior agreement other than the Put Agreements, and no mention was made of the prior Events of Default.

(6) *The August 2000 Default*

The Page defendants failed to pay for the Stockton Bonds on August 1, 2000, as provided for in the July 14 Agreement. On August 18, 2000, MCAP commenced an action against the Page defendants and Paul and Susan Garcia in the Supreme Court for the State of New York, County of New York (Civ. No. 00/603568) for breach of the Put Agreements on the Stockton Bonds (the "New York Action").

(7) *Termination of the July 14 Agreement*

On August 23, 2000, Richard G. Corey, Managing Partner of MCAP, sent a letter to Page, which stated:

> As you know, you signed a settlement agreement on July 14, 2000 with [MCAP] (the "July Agreement"). Your continuing failure, among other things, to purchase the Stockton Gardens and Stockton Terrace Bonds are in flagrant breach of the July Agreement. Unless a new agreement with appropriate protections for MCAP can be promptly entered, MCAP intends to terminate the July Agreement in view of your breaches and pursue claims at law, including through the action recently commenced against you, Sue Garcia and the estate of Paul Garcia in New York.
>
> I am enclosing a proposed form of a restated agreement for your review. Please be advised that unless all relevant parties have executed such a re-

stated agreement on or before Friday, August 25, 2000, MCAP intends to declare a termination of the July Agreement on such date.

No restated agreement was entered into and no payment was made by the Page defendants by August 25, 2000. On that date, Corey sent a letter to Page declaring "in view of your prior breaches of the Settlement Agreement of July 14, 2000, MCAP is hereby terminating that agreement, and will pursue all available remedies."

### (8) *The October 6 Partial Settlement Agreement*

Negotiations toward a settlement of the issues in the New York Action began in September 2000.[3] From these negotiations, it became clear that MCAP, relying on the terms of the July 14 Agreement, believed that the Page defendants owed 110% of the principal on both Stockton Bonds. The Page defendants, however, relying on the terms of the June 1998 Put Agreements, contended that they owed only 100% of the principal.

On October 6, 2000, the parties entered into a partial settlement agreement that narrowed the scope of their dispute (the "October 6 Agreement"). The October 6 Agreement provided for an immediate transfer of the Stockton Bonds and payment of 100% of the principal by defendants. MCAP expressly preserved its claim for the disputed 10% penalty. This agreement released the Garcia parties from all current and future actions. The parties also stipulated to a discontinuance of the New York Action. MCAP indicated it would commence an action in Federal court against the Page defendants for the breach of the July 14 Agreement, and for breach of the Put Agreements. The October 6 Agreement expressly provided that MCAP intended to assert claims in federal court not only for the 10% difference on the Stockton Bonds, but that MCAP "may also assert ... claims relating to provisions of the Settlement Agreement other than those relating to the [Stockton Bonds]." Pursuant to the October 6 Agreement, the Page defendants did pay 100% of the Stockton Bond principal.

### B. The Susanville Bonds and the Sampson Bonds

#### (1) *The July 14 Settlement Agreement*

MCAP purchased the Susanville Bonds and the Sampson Bonds some time before July 2000. The bonds were issued in connection with housing projects in which Page had ownership interests. The original purchase agreements did not contain a "put" provision. In July 2000, the Susanville and Sampson Bonds became two of the six sets of bonds dealt with in the July 14 Agreement. The parties agreed to a put, modeled on a previous put agreement executed in connection with MCAP's purchase of the Sunset Bonds. The Susan-

---

**3.** Both sides have submitted evidence of letters that passed between their attorneys between the commencement of the New York Action and their first settlement agreement—a July 25, 2000 letter from defendants' counsel to plaintiff's counsel, a July 26, 2000 letter amending the July 25, 2000 letter, and a July 29 letter from defendants' counsel to plaintiff's counsel memorializing a telephone conversation between the two. As J. David Page correctly noted in his affidavit [Page Aff., p. 17 n. 6], the inclusion of these letters on this motion is a violation of Rule 408 of the Federal Rules of Evidence. Statements made in compromise negotiations are inadmissible, *see* Fed.R.Evid. 408, and may not be considered by a trial court on a summary judgment motion, *see* Fed.R.Civ.P. 56. *See also Robbins v. Moore Medical Corp.*, 894 F.Supp. 661, 671 n. 12 (S.D.N.Y.1995). Because these letters contain statements made in compromise negotiations, the Court will not rely on them in its decision on this motion.

ville and Sampson puts, as provided for in the July 14 Agreement, were virtually identical. The only material difference between the two provisions is that the Sampson Bonds had to be paid sometime before October 31, 2000, or else the Page defendants would be liable, jointly and severally, for all collection and enforcement costs incurred by MCAP, and the Susanville Bonds had to be paid sometime before March 31, 2001, or else the Page defendants would be liable for the collection and enforcement costs. Paragraphs 1(a) and 2(a) of the July 14 Agreement provided that:

> The Page Parties, jointly and severally, agree that MCAP I has given good and valid notice of the exercise a right [sic] to Put the [Sampson/Susanville] bonds to them, such Put right deemed given on the terms set forth in the certain Put Agreement made as of June 3, 1998 by and among, *inter alia,* Page and MCAP I pertaining to the CSCDA Multifamily Housing Revenue Bonds (Sunset Manor Apartments) 1998 Series K (the "Sunset Put Agreement"), modified as follows: (i) the Put right shall be exercisable whether or not a "Conversion" shall have occurred (as that term is used in the Sunset Put Agreement), *(ii) the purchase price upon exercise of the Put shall be equal to the sum of all accrued and unpaid interest stated therein (including any applicable late payment charges and default interest rates which may hereafter accrue in the event of a default or late payment(s) thereon) due and owing through and including the date the Put price is paid plus (x) 110% of the Principal Amount thereof then outstanding if the Put price is paid on or after October 1, 2000, or (y) 105% of the Principal Amount thereof then outstanding if the Put price is paid before October 1, 2000, and* (iii) the Page Parties may pay the Put price at any time on or before [October 31, 2000 for the Sampson Bonds/ March 31, 2001 for the Susanville Bonds], *but if paid after [October 31, 2000 for the Sampson Bonds/ March 31, 2001 for the Susanville Bonds], MCAP I shall be further entitled to reimbursement from the Page Parties, jointly and severally, of all collection and enforcement costs incurred by MCAP, with the Page Parties consenting to jurisdiction and dispute resolution in the U.S. District Court(s) sitting in New York, N.Y.*

The July 14 Agreement was purportedly terminated on August 25, 2000, after defendants' failure to pay for the Stockton Bonds but well before either the Sampson or Susanville Bonds fell due. On October 24, 2000, MCAP filed its complaint with this Court, as anticipated in the October 6 Agreement. In the Complaint, MCAP petitioned the Court to "direct[ ] defendants to purchase the Sampson, Susanville and Sunset bonds on the agreed contractual terms," even though MCAP had "terminated" .the July 14 Agreement two months earlier. J. David Page contends that "[o]nly when [he] received and read MCAP's Complaint in this lawsuit did [he] know for sure that MCAP apparently never really meant to 'terminate' the July 14th Agreement, despite the wording of Mr. Corey's August 25th fax; instead, it meant to specifically enforce the July 14th Agreement with respect to those transactions that had not yet been consummated—the purchases of the Sampson, Sunset and Susanville Bonds." [Page Aff., ¶ 31.]

(2) *The January 18 Settlement Agreement*

Whether the July 14 Agreement was terminated or not, the parties worked towards narrowing their legal disputes. On January 18, 2001, the parties entered into yet another partial settlement agreement

(the "January 18 Agreement"). The January 18 Agreement narrowed the scope of disagreement on three bond issues covered under the July 14 Agreement—the Sampson, Susanville and Sunset Bonds.

In this agreement, the Page defendants agreed to pay 100% of the principal, plus accrued interest, of the Sampson and Susanville Bonds, and preserved its rights to seek the disputed 10% in court. Specifically, the January 14th Agreement provides:

10. *Sale of the Sampson Bonds:* On or before February 15, 2001:(1) MCAP shall transfer and deliver against payment to Newman, on behalf of the Page Parties, the Sampson Bonds; and (2) the Page Parties, through Newman, *shall deliver and pay to MCAP 100% of the principal amounts of such bonds, plus all accrued interest.* Upon such payment and delivery of the Sampson Bonds, MCAP shall have no further claims against the Page Parties with respect to the Sampson Bonds and the Sampson Garden Apartments, except as described in paragraph 17 below. The parties agree that 100% of the principal amount of the Sampson Bonds, and all accrued interest, is as follows:

| 100% of Principal or Accreted Amount | Accrued Interest Through 2/15/01 |
|---|---|
| $2,216,676.53 | $21,323.44 |

11. *Sale of the Susanville Bonds:* On or before April 30, 2001:(1) MCAP shall transfer and deliver against payment to Newman, on behalf of the Page Parties, the Susanville Bonds; and (2) the Page Parties, through Newman, *shall deliver and pay to MCAP 100% of the principal amounts of such bonds, plus all accrued interest.* Upon such payment and delivery of the Susanville Bonds, MCAP shall have no further claims against the Page Parties with respect to the Susanville Bonds and the Susanville Garden Apartments, except as described in paragraph

17A below. The parties agree that 100% of the principal amount of the Susanville Bonds, and all accrued interest, is as follows:

| 100% of Principal or Accreted Amount | Accrued Interest Through 2/15/01 |
|---|---|
| $2,051,475.40 | $29,325.00 |

The January 18 Agreement provided for additional interest to be paid by the Page defendants if payments were not made on the Susanville or Sampson Bonds on the dates specified in the agreement. The July 18 Agreement provided that if payment was not made on the specified dates, the Page defendants agreed to pay "in addition to and over and above [100% of the principal and accrued interest] . . . an additional interest payment of 4% per annum of the put price. Such additional interest payment shall in all cases be assessed retroactively to January 1, 2001 and continue until MCAP receives from the Page Parties all of the amount specified above . . . for the [Sampson and Susanville Bonds], and shall be compounded monthly."

MCAP preserved it's right to seek the disputed 10% penalty in court, as follows:

17. *Preservation of Certain Claims Against the Page Parties (Sampson):* The parties agree and acknowledge that upon consummation and sale of the Sampson Bonds in accordance with paragraph 10, above: (1) MCAP is still preserving and will be free to assert against the Page Parties in the pending Federal Court Action MCAP's claims that (1) the Page Parties were obligated under the July 14th Settlement Agreement to pay 110% of the principal amounts of the Sampson Bonds, not 100% (the "Sampson 10% Difference"), (b) the Sampson 10% Difference, and any interest lawfully accruing thereon or damages relating thereto, remains due and owing to MCAP, and (c) the Page Parties are liable for MCAP's at-*

*torneys' fees and other enforcement costs relating to the Sampson Bonds;* .... The Page Parties dispute and contest all such claims set forth in section (1) of this paragraph, and preserve all rights to seek a contrary judicial adjudication of such claims. This paragraph 17 shall not be interpreted to release MCAP's claims with respect to bonds other than the Sampson Bonds.

The following paragraph of the January 18 Agreement, which deals with the Susanville Bonds, contains the identical provisions.

#### (3) *The Breaches Under the January 18 Agreement*

Under the January 18 Agreement, the Page defendants agreed to pay, on specified dates, 100% of the principal plus accrued interest on the Susanville and Sampson bonds. In compliance with the January 18 Agreement, the Page defendants did pay 100% of the principal amount of the Sampson bonds on February 15, 2001. This left the 10% difference plus collection and enforcement costs as

the only open issue on the Sampson Bonds.

On April 20, 2001, MCAP advised the Page defendants that they were tendering transfer and delivery of the Susanville Bonds, effective April 30, 2001, in accordance with the January 18 Agreement. The Page defendants did not make payment on April 30, and have failed to make any payments on the Susanville Bonds to this day.

#### C. The Claims in this Action

On March 6, 2001, MCAP filed an Amended Complaint with this Court. The Amended Complaint alleged that the Page defendants were liable for the Stockton Bonds 10% difference, the Sampson and Susanville Bonds 10% difference and all collection and enforcement costs and interest. The Amended Complaint acknowledged that at the date of its filing, the defendants remained obligated to purchase the Susanville Bonds on specified terms on or before April 30, 2001. MCAP alleges that the amounts due to them are as follows:

| Bond Issue | Nature of Obligation | Amount |
|---|---|---|
| Stockton Bonds | 10% Difference | $463,000 (as of August 1, 2000) |
| Sampson Garden | 10% Difference | $221,667.65 (as of Feb. 15, 2001) |
| Susanville Bonds | 100% of Principal plus accrued interest | $2,080,800.40 (as of Apr. 30, 2001) |
| Susanville Bonds | 10% Difference | $205,147.54 (as of Apr. 30, 2001) |
| Susanville Bonds | 4% Penalty | $30,258.17 (as of May 1, 2001) |

*See* Corey Aff., ¶ 28. MCAP asserts that these amounts will increase with contractual accruals or statutory interest between the indicated dates and the date of this Court's judgment.

For the reasons stated below, MCAP's motion for summary judgment is granted in part and denied in part.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the record "in the light most favorable to the non-moving party," *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir.1989) (citations omitted), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975) (citations omitted).

Under New York law, to establish a breach of contract a plaintiff must plead and prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. *See First Investors Corp. v. Liberty Mut. Ins. Corp.*, 152 F.3d 162 (2d Cir.1998). Summary judgment is appropriate in a breach of contract action where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning. See *Fulton Cogeneration Assoc. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 98 (2d Cir.1996). Contract language is unambiguous when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Ins. Co. of North America*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).

### B. 100% of the Susanville Bonds Principal

This claim is easily disposed of. The Page defendants agreed, on January 18, 2001, to pay "100% of the principal amounts of [the Susanville Bonds], plus all accrued interest" on or before April 30, 2001. Furthermore, if payment was not made by April 30, 2001, the Page defendants agreed to pay "in addition to and over and above [100% of the principal and accrued interest] . . . an additional interest payment of 4% per annum of the put price. Such additional interest payment shall in all cases be assessed retroactively to January 1, 2001 and continue until MCAP receives from the Page Parties all of the amount specified above (in paragraph 11) for the Susanville Bonds, and shall be compounded monthly."

The Page defendants made no payments before April 30, 2001, and have made no payments to this date. They suggest no reason why performance was excused. The terms of the agreement are unambiguous, and the Page defendants have breached these terms. Summary judgment is granted to plaintiffs on the issue of liability. Damages will be assessed at 100% of the principal, plus all accrued interest to the date of the judgment, and additional interest at 4% per annum of the put price, compounded monthly, from January 1, 2001 to the latest judgment.

### C. The Stockton Bonds

The Page defendants have paid MCAP 100% of the Stockton Bonds. The parties strongly disagree as to whether 10% of the principal amount of the bonds is still due and owing. In the October 6 Partial Settlement Agreement, MCAP preserved its right to assert its claim for the disputed 10% difference of the Stockton Bonds.

MCAP contends that a 10% penalty, or premium, on each of the Stockton Bonds is

owed because the clear language of the July 14 Agreement provides that "[t]he Page Parties will pay the Put price for the Stockton Bonds pursuant to the Put Agreement dated as of July 20, 1998 pertaining to the Stockton [Terrace and Gardens] Bonds on or prior to August 1, 2000 *at the Put price stated therein (i.e., 110%)*" (emphasis added). MCAP argues that the clarity of this provision of the July 14 Agreement prevents consideration of any parol evidence, and that summary judgment in its favor is appropriate.

In response, the Page defendants contend that the July 14 Agreement directly refers to and incorporates the Put Agreements, and the Put Agreements do not provide for any 10% premium or penalty. Rather, the Put Agreements provide that the price of the bonds is "a purchase price equal to the Principal Amount thereof then outstanding and all interest (if any) then due and payable on the bonds," *see* Put Agreements, ¶ 2.1, *i.e.*, 100% of the principal only. Thus, the reference in the July 14 Agreement to a put price, as stated in the Put Agreement, of 110%, conflicts with the terms of the Put Agreement. Furthermore, defendants argue that neither the Indentures nor the Loan Agreements provide for a 10% premium in the event of a default, at least not in the absence of formal default and foreclosure procedures. Defendants argue that these contradictions create an ambiguity within the contract, that parol evidence is necessary to resolve this ambiguity, and, as a result, summary judgment is inappropriate.

I must review these claims in the light most favorable to the Page defendants. *See Leberman*, 880 F.2d at 1559.

### (1) *Parol evidence rule*

The New York Court of Appeals has explained the parol evidence rule as follows:

A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing. That rule imparts stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses[,] infirmity of memory and the fear that the jury will improperly evaluate the extrinsic evidence.

*W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990) (internal citations omitted).

The parol evidence rule bars the introduction and consideration of extrinsic evidence of the meaning of a complete written agreement, if the terms of the agreement are clear and unambiguous. *Id.* at 162–63, 566 N.E.2d at 642, 565 N.Y.S.2d at 443. If the terms of the complete written contract are unclear, ambiguous or contradictory, however, the parol evidence rule permits the consideration of such evidence in order to ascertain the true meaning of the terms. *See Wayland Investment Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F.Supp.2d 450, 454 (S.D.N.Y.2000); *see generally Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir.1998); *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988); *Gambling v. Commissioner of Internal Revenue*, 682 F.2d 296, 300 (2d Cir.1982); 58 N.Y. Jur.2d, Evidence & Witnesses, §§ 490, 515, 753 (1986). The parole evidence rule is a rule of substantive law, and not one of procedure or evidence. *Wayland Investment*, 111 F.Supp.2d at 454; *Woodling v. Garrett*

*Corp.,* 813 F.2d 543, 552 (2d Cir.1987); *Potsdam Cent. Schs. v. Honeywell, Inc.,* 120 A.D.2d 798, 799, 501 N.Y.S.2d 535, 537 (3d Dep't 1986).

In order to apply the parol evidence rule, this Court must employ a three-step inquiry: (1) determine whether the written contract is an integrated agreement; if it is, (2) determine whether the language of the written contract is clear or is ambiguous; and, (3) if the language is clear, apply that clear language. *See Wayland Investment,* 111 F.Supp.2d at 454; *Investors Ins. Co. v. Dorinco Reinsurance, Co.,* 917 F.2d 100, 103–05 (2d Cir.1990); *see also Machine–Outils Henri Line Ltee v. Morey Machinery, Inc.,* No. 94 Civ. 8880, 1996 WL 254863, at *6 (S.D.N.Y. May 14, 1996).

### a. Integration

The first step in the application of the parol evidence rule is to determine whether the written contract is integrated. An integrated contract is one which "represents the entire understanding of the parties to the transaction." *Investors Ins. Co.,* 917 F.2d at 104. "[U]nder New York law, a contract which appears complete on its face is an integrated agreement as a matter of law." *Battery Steamship Corp. v. Refineria Panama, S.A.,* 513 F.2d 735, 738 n. 3 (2d Cir.1975) (citing *Higgs v. De Maziroff,* 263 N.Y. 473, 478, 189 N.E. 555, 557 (1934)). If the written document "appears to contain the engagements of the parties, and to define the object and measure the extent of such engagement, [then] it constitutes the contract between them, and is presumed to contain the whole of that contract." *Wayland Investment,* 111 F.Supp.2d at 454 (quoting *Eighmie v. Taylor,* 98 N.Y. 288, 1885 WL 10558 (1885)).

In this action, the Page defendants contend that the July 14 Agreement does not constitute the entire contract between the parties. Defendants note that the July 14 Agreement directly incorporates the 1998 Stockton Put Agreements, and these two contracts, read together, comprise the entire written agreement between the parties. The July 14 Agreement lacks a merger clause. In such an instance, "the court must determine whether or not there is an integration [of the two contracts] by reading the writing in the light of surrounding circumstances, and by determining whether or not the [other] agreement was one which the parties would ordinarily be expected to embody in the writing." *Wayland Investment,* 111 F.Supp.2d at 454 (quoting *Braten v. Bankers Trust Co.,* 60 N.Y.2d 155, 162, 456 N.E.2d 802, 805, 468 N.Y.S.2d 861, 864 (1983) (internal citations omitted)).

After examination of the terms of the July 14 Agreement, I find that the combination of the July 14 Agreement and the Put Agreements comprises the entire integrated agreement. Each paragraph of the July 14 Agreement that addresses a series of bonds directly references and incorporates a previous contract's terms and provisions. Paragraphs 1, 2 and 3 of the July 14 Agreement refer to and modify the terms set forth in the Sunset Put Agreement agreed to by both parties on June 3, 1998. Paragraph 6 refers to the Forbearance Agreement entered into by both parties on June 22, 2000. And Paragraphs 4 and 5, the Stockton Bonds provisions at issue here, refer directly to the July 20, 1998 Put Agreements. The terms of these agreements together reflect the entire written agreement. Incorporation of the Put Agreement is necessary to provide provisions for the calculation of the put price itself, the conditions governing the parties, and various other considerations governing the execution of the Put. I find that the July 14 Agreement and the Put Agreements it incorporates by reference

constitute the integrated agreement of the parties relating to the Stockton Bonds.

### b. Interpretation

The second step of the parol evidence inquiry is the determination of whether the language of the written agreement is clear or ambiguous. *See Wayland Investment*, 111 F.Supp.2d at 455. "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs.*, 77 N.Y.2d at 162, 566 N.E.2d at 642, 565 N.Y.S.2d at 443; *see Alexander & Alexander Servs.*, 136 F.3d at 86. An ambiguity arises if "the terms of a contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Alexander & Alexander Servs.*, 136 F.3d at 86 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).

█ In this instance, the integrated contract contains an ambiguity, as noted above. The July 14 Agreement specifically provides that the put price stated in the Put Agreements is "*i.e.* [that is to say] 110%." The Put Agreements, however, directly contradict the July 14 Agreement by providing that the put price is equal to 100% of the principal plus interest. The terms of the entire written agreement are contradictory and ambiguous, and therefore preclude application of the third and final step of the inquiry, whether there was a breach of the written contract.

"The rule is well settled that the construction of a plain and unambiguous contract is for the court to pass on, and the circumstances extrinsic to the agreement will not be considered when the intention of the parties can be gathered from the instrument itself." *Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corporation*, 430 N.Y.S.2d 179, 184, 76 A.D.2d 68, 76–77 (4th Dep't 1980) (citations omitted). *See also Alternative Thinking Systems, Inc. v. Simon & Schuster, Inc.*, 853 F.Supp. 791 (S.D.N.Y.1994); *Marvel Entertainment Group, Inc. v. ARP Films, Inc.*, 684 F.Supp. 818 (S.D.N.Y.1988). It is not within this Court's power to decide the issues of fact presented in this action on a motion for summary judgment. *See Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990) ("Nonetheless, in order for a district court to grant summary judgment in [a contract] case, there may not be any genuine issue regarding the inferences to be drawn from the language.").

Summary judgment as to the Stockton Bonds is denied.

### D. The Susanville and Sampson Bonds 10% Premium

Plaintiff alleges that the Page defendants owe a 10% premium on the principal amounts of the Susanville and Sampson Bonds, as provided for in the July 14 Agreement. The relevant provision of the July 14 Agreement provides that "the purchase price upon exercise of the Put shall be equal to the sum of all accrued and unpaid interest stated therein (including any applicable late payment charges and default interest rates which may hereafter accrue in the event of a default or late payment(s) thereon) due and owing through and including the date the Put price is paid *plus (x) 110% of the Principal Amount thereof then outstanding if the Put price is paid on or after October 1, 2000, or (y) 105% of the Principal Amount thereof then outstanding if the Put price is paid before October 1, 2000.* (emphasis added)" MCAP asserts that it rightfully terminated the July 14 Agreement because the

Page defendants materially breached the agreement by failing to make multiple payments on the Stockton Bonds, and that the Page defendants now owe it a 10% premium as provided for in the July 14 Agreement.

The Page defendants argue that they owe nothing further under the July 14 Agreement because MCAP wrongfully repudiated the agreement on August 25, 2000. They claim that the July 14 Agreement was a severable contract that could not be terminated based upon the alleged defaults on two of its six divisible parts. In the alternative, the Page defendants argue that the alleged defaults on the Stockton Bonds were not material breaches of the entire agreement, and did not permit termination of the whole agreement. They argue that, despite the premiums provided for in the July 14 Agreement, they should be discharged from all responsibilities under the July 14 Agreement because of MCAP's wrongful termination.

I find that the July 14 Agreement was not severable, and MCAP's termination of the agreement on August 25, 2000 was justified because of defendants' material breach. I conclude, however, that defendants are liable for the 5% difference provided for in the agreement, as the contract was terminated prior to October 1, 2000, the date when the 10% difference would accrue under the agreement.

(1) The July 14 Agreement was not severable

If the July 14 Agreement was a severable, rather than an entire contract, MCAP's termination of the whole contract on August 25, 2000 would have been improper. *See Ripley v. Int'l Rys. Of Cent. America,* 8 N.Y.2d 430, 437–38, 209 N.Y.S.2d 289, 171 N.E.2d 443 (1960) ("If the contract consists of several distinct and independent parts, each of which can be performed without reference to the other, a failure of one of the parties to perform one of the terms does not authorize the other to rescind the whole and refuse to accept performance of the other terms by the party so in default.") (quoting *Bamberger Bros. v. Burrows,* 145 Iowa 441, 451, 124 N.W. 333, 337 (1910)).

■ There is no precise test for determining whether a contract is severable or entire. *See Unisys Corp. v. Combined Technologies Corp.,* No. 87 Civ. 1449, 1988 WL 78148, at *2 (July 19, 1988 S.D.N.Y.). In making such a determination, the primary factor to consider is the intent of the parties as determined by a fair construction of the terms and provisions of the contract itself, by the subject matter to which it has reference, and by the circumstances existing at the time of contracting. *See Nederlandse, Etc. v. Grand Pre-Stressed Corp.,* 466 F.Supp. 846, 852 (E.D.N.Y.), *aff'd* 614 F.2d 1289 (2d Cir. 1979), citing *Rudman v. Cowles Comm., Inc.,* 30 N.Y.2d 1, 14, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867 (1972); *Rogers v. Graves,* 254 A.D. 467, 5 N.Y.S.2d 967, 971 (3d Dep't 1938).

■ A contract is generally considered to be entire when, by its terms and purposes, it contemplates that all of its parts are interdependent and common to one another. A contract is severable when its nature and purpose are susceptible to division and apportionment. *Id.* Under New York law, "a contract will not be regarded as severable" unless "(1) the parties' performances can be apportioned unto corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalents." *Ginett v. Computer Task Group, Inc.,* 962 F.2d 1085, 1091 (2d Cir.1992); *see also* Restatement (Second) of Contracts § 240.

A fair construction of the terms, subject matter and circumstances surrounding the July 14 Agreement show that the agreement was not severable.

A consideration of the circumstances at the time and the subject matter of the agreement supports the conclusion that the July 14 Settlement Agreement was an entire contract. First, there was no severability clause, which militates against a finding of severability. *See F & K Supply, Inc. v. Willowbrook Development Co.*, 288 A.D.2d 713, 732 N.Y.S.2d 734, 738 (3d Dep't 2001). The July 14 Agreement was a settlement agreement, and the parties, in their negotiations, made various interdependent concessions in order to come to a final resolution of their differences. MCAP made concessions to the Page defendants. For instance, MCAP deferred payment on the Stockton Bonds and agreed to forbear from foreclosing on Elden Terrace, another property covered in the July 14 Agreement, for no discernible benefit within those respective provisions. The Page defendants also made various concessions. The Page defendants agreed to create Put Agreements for the Sampson and Susanville bonds, when there were none previously. It is logical that each party would "impair its rights with regard to some bond issues in exchange for promises related to other bond issues." [Pl. Reply Mem., at p. 9.] The terms of the contract are interdependent on each other, and only when taken together comprise an entire contract.

(2) There was a material breach of the July 14 Agreement

Defendants argue that even if the July 14 Agreement was an entire contract, and not a divisible one, the Page defendants' alleged breach with respect to nonpayment of the Stockton Bonds was immaterial. [Def. Mem. In Opp. at 16.]

Defendants contend that "[e]ven if the Page parties' performance with respect to the Stockton Bonds were delayed, MCAP would still be able to receive substantially what it had bargained for under the July 14 Agreement," and that therefore "MCAP ... had no right to terminate the whole agreement." *Id.* Furthermore, defendants allege that MCAP's wrongful repudiation of the entire contract constituted a material breach of the July 14 Agreement, and "thus the Page parties should be discharged from further performance under the [agreement]." *Id.* at 17.

Defendants' failure to pay the over five million dollars owed for the Stockton Bonds on August 1, 2000 did constitute a material breach of the July 14 Agreement. *See Jafari v. Wally Findlay Galleries*, 741 F.Supp. 64, 67 (S.D.N.Y.1990) ("We find that the [buyers] failed to pay the sellers any money ... indeed it is difficult to imagine anything more material," *quoting Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1014 (D.C.Cir.1985)). *See also Truglia v. KFC Corp.*, 692 F.Supp. 271, 276 (S.D.N.Y.1988), *aff'd without op.*, 875 F.2d 308 (2d Cir.1989). In light of this material breach of a non-severable contract, MCAP had the right to treat defendants' failure to pay as a total breach, to terminate the entire contract and to sue for damages. *See, e.g., ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir.1991). "The injured party's claim for damages for total breach takes the place of its remaining substantive rights under the contract. Damages are calculated on the assumption that neither party will render any further performance." 2 Farnsworth on Contracts, Second Edition, § 8.15 at 490 (1998).

a. Remedy

MCAP terminated the July 14 Agreement on August 25, 2000, and dam-

ages must be calculated as of that date. *See id.* The July 14 Agreement established two different put prices depending on the date of payment: 105% of the principal amount then outstanding if paid before October 1, 2000, and 110% of the principal amount then outstanding if paid on or after October 1, 2000. MCAP chose to terminate the contract before October 1, 2000, thereby preventing the Page defendants from making its contractual payments before October 1, 2000 at the 105% rate. Damages due by the Page defendants, as of August 25, 2000, equals 105% of the principal amounts then outstanding on the Susanville and Sampson Bonds.

## CONCLUSION

MCAP's motion for summary judgment is granted insofar as the Page defendants must pay 105% of the principal of the Susanville Bonds, plus accrued interest and a 4% penalty, and a 5% premium on the 100% principal of the Sampson Bonds already paid by the Page defendants. MCAP's motion for summary judgment for the 10% premium on the Stockton Terrace and Stockton Garden Bonds is denied.

This constitutes the order and decision of the Court.