Kalman WEISS, As Assignee, et al. Plaintiffs,

v.

LA SUISSE, SOCIÉTÉ D'ASSURANCES SUR LA VIE, Defendant.

No. 97 Civ.01352CMMDF.

United States District Court, S.D. New York.

Nov. 25, 2003.

See also 260 F.Supp.2d 644.

Richard M. Mahon, Drake, Sommers, Loev, Tarhis & Catania, P.C., Newburg, NY, for Plaintiffs.

Richard N. Chassin, Richard Niles Chassin, Becker, Glynn, Melamed & Muffly, New York City, for Defendants.

## DECISION ON OUTSTANDING IN LIMINE MOTIONS

MCMAHON, District Judge.

Plaintiffs, thirty members of New York's Chassidic communities, bring this action against defendant La Suisse, a Swiss insurance company, alleging discrimination under 42 U.S.C. § 1981 ("Section 1981") and breach of contract. This decision is the sixth in a series of reported decisions dating back to September of 1999. *See Weiss v. La Suisse*, 260 F.Supp.2d 644 (S.D.N.Y.2003) ("*Weiss VI*"); *Weiss v. La Suisse*, 161 F.Supp.2d 305 (S.D.N.Y.2001) ("*Weiss IV*"); *Weiss v. La Suisse*, 154 F.Supp.2d 734 (S.D.N.Y.2001) ("*Weiss III*"); *Weiss v. La Suisse*, 131 F.Supp.2d 446 (S.D.N.Y.2001) ("*Weiss II*"); *Weiss v. La Suisse*, 69 F.Supp.2d 449 (S.D.N.Y. 1999) ("*Weiss I*"). The relevant facts of this case have been outlined in prior opinions, and familiarity with the facts is assumed.

Before this court now are several motions in limine from 2001 and 2003. In its May 22, 2003 motion, La Suisse moved to dismiss Plaintiffs' contract claims and exclude certain evidence regarding non-similarly situated policy holders. In response, Plaintiffs have renewed their request for a Rule 44.1 ruling on foreign law issues, initially raised in their December 2001 motion in limine. In the December 3, 2001 motion in limine, Plaintiffs also sought to exclude evidence regarding Defendant's dismissed counterclaim for fraud and evidence of La Suisse's loss on the marriage policy portfolio at issue in this case. In their own 2001 motion in limine, La Suisse sought to preclude: testimony from Dr. Rosenberg; evidence regarding certain administration rules for brokers; parol evidence regarding terms of the insurance contracts that relate to claims for a pro-rata refund; evidence of reinsurance purchased by Defendant; evidence about "Operation Tell"; evidence regarding Defendant's corporate parent and; testimony from witnesses not listed in Plaintiffs' interrogatory responses. Each of these motions will be addressed below, beginning with the most recent.

## I. Defendant's May 22, 2003 Motion In Limine

### A. *Choice of Law*

In *Weiss III*, I held that the policies' choice of law provision, which provides that "the policy is governed by ... Swiss law, in particular the Federal Law on Insurance Contract of April 2, 1908" did not violate New York's public policy and could therefore be enforced. *Weiss*, 154 F.Supp.2d at 740–741. I address this issue in light of Plaintiffs' contention that Swiss law "points back" to New York law in certain cases involving consumer contracts. Both parties have addressed this issue in several briefs and through expert reports, which I have considered. I now adhere to my prior ruling that Swiss substantive law,

not New York law, governs the construction and effect of the policies in this case.

In response to Defendant's Motion *In Limine* Seeking to Dismiss all Contract Claims or Exclude Evidence Related to Them (discussed below), Plaintiffs have renewed their contention that New York law should govern the construction and effect of the marriage policies. According to Plaintiffs' experts, Dr. Schnyder and Dr. Patocchi, the choice of law provision in § 2.2 of the General Conditions governing the policies at issue is not binding on the Plaintiffs because a choice of law clause accepted by a consumer is inadmissible under Art. 120 of the Swiss Federal Private International Law Act of 1987 ("1987 Act"). (Expert Opinion of Drs. Schnyder and Patoochi, "Pl. Exp. Report", pp. 9, 15). The 1987 Act contains the Swiss conflicts of laws provisions. *Id.* Plaintiffs argue that under Swiss law, specifically Art. 120 of the 1987 Act, choice of law provisions in consumer contracts are disfavored and courts are directed to apply the law of the consumer's "habitual residence." (Pl. Mem. in Opp., 2). Plaintiffs' experts have provided a detailed analysis explaining why these insurance policies qualify as consumer contracts, and argue that New York law governs their construction, the choice of law clause not withstanding.

■ However, according to Plaintiffs' own experts, Art. 120 of the 1987 Act is a conflicts of law provision under Swiss law, not a rule of substantive law. (Pl.Exp. Rpt., 22, 28) Accepting this proposition as true (which I do), I conclude that Art. 120 drops out of the case because New York courts look to New York and not foreign conflicts provisions. *See Anderson v. SAM Airlines,* 939 F.Supp. 167, 175 (E.D.N.Y.1996).

This has long been the rule. In *Siegelman v. Cunard White Star, Ltd.,* 221 F.2d 189 (2d Cir.1955), Judge—later Justice—

Harlan, held that a choice of law provision on a passenger ticket requiring application of English law embraced only the substantive law and not the whole law of England including conflicts provisions. Harlan reasoned that "surely the major purpose of including the provision in the ticket was to assure [defendant] of a uniform result in any litigation no matter where the ticket was issued or where the litigation arose." *Id.* at 194; *see also Sears Roebuck & Co. v. Enco Assoc. Inc.,* 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (N.Y.1977) (contract provision that the agreement was to be governed by Michigan law operated only to import the substantive law of Michigan) (statute of limitations holding overruled by statute limiting SoL in malpractice actions); *Reger v. National Ass'n of Bedding Mfrs. Group Ins. Trust Fund,* 83 Misc.2d 527, 372 N.Y.S.2d 97, (N.Y.Sup.Ct. 1975) (applying chosen law in group insurance policy despite fact that the "paramount interests" weighed heavily in favor of applying New York law); *Chan v. Society Expeditions, Inc.,* 123 F.3d 1287, 1297 (9th Cir.1997) (reversing lower court, which applied U.S. conflicts of law analysis when U.S. was chosen state, because choice of law provision refers only to the substantive laws of the chosen state); *Odin Shipping Ltd. v. Drive Ocean V MV,* 221 F.3d 1348, 1348 (9th Cir.2000) (Despite contractual election of laws of British Columbia, United States [forum] law determined the enforceability of a choice of law provision, but not its scope).

More recently in *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), the Supreme Court noted that a "choice of law provision, when viewed in isolation, may reasonably be considered a substitute for the conflicts-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual rela-

tionship." 514 U.S. at 59, 115 S.Ct. 1212. In that case, the Court interpreted a contract with a choice-of-law clause electing New York law (which precludes arbitrators from awarding punitive damages) and an arbitration clause calling for arbitration in accordance with the NASD rules (which empowers arbitrators to impose punitive damages). The Court held that "the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass *substantive principles* that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other." *Id.* at 63–64, 115 S.Ct. 1212. (emphasis added).

Thus, courts typically do not apply a conflicts analysis—let alone the conflicts law of the state whose law has been selected as governing—where the parties have expressly provided that a certain law applies. Were courts to apply the chosen state's conflicts analysis, there would be no guarantee that the chosen state's laws would apply.

La Suisse included the choice of law provision in the insurance policies to create some predictability regarding the interpretation of its insurance contracts which are sold throughout the world. Were I to follow Plaintiffs' analysis, there would be no such predictability. In some cases Swiss law might apply; in others, Israeli, English or U.S. law might apply—all because Swiss conflicts-of-law principles (rather than its substantive law principles)

point back to the law of the beneficiaries' state.

Moreover, applying Plaintiff's logic would draw the case into the renvoi "bog" generally disfavored by New York courts.[1] *See Makarova v. U.S.*, 201 F.3d 110 (2d Cir.2000) (declining to enter the renvoi "bog"); *Ledwith v. Sears Roebuck and Co., Inc.*, 231 A.D.2d 17, 24, 660 N.Y.S.2d 402, 406 (1st Dep't.1997) (noting courts disfavor applying renvoi with respect to statutes of limitations); *Rescildo v. R.H. Macy's*, 187 A.D.2d 112, 594 N.Y.S.2d 139 (1st Dep't 1993) (court would not apply doctrine of renvoi which would have required, when applying borrowing statute, that court borrow foreign jurisdiction's choice-of-law rules, which prescribed use of New York's statute of limitations). The Second Restatement of Conflict of Laws likewise favors applying the "local law" (i.e., the substantive law) of the chosen state (as opposed to its conflicts provisions) in order to avoid the renvoi problem, particularly in contract and tort cases. (*See* Rest.2d Conf. § 8(a), comment j).

For these reasons, I find that Swiss conflicts of law provisions have no applicability. Since Art. 120 is a conflicts provision it has no applicability in this case. Per the terms of the policies, their construction and effect are governed by Swiss law.

### B. *What is Swiss Law?*

The jury in this case will be charged regarding the applicable Swiss contract principles. It is the Court's role to decide what those principles are in advance of trial. *See* F.R.C.P. 44.1. In an order dated May 8, 2003, I told Defendant to

---

1. Renvoi is the French word for "send back" and is used in the legal context to refer to a situation which arises when a court applying foreign law applies the foreign choice of law rules, which refer back to the law of the forum state, thus creating an endless cycle in which the conflicts provisions of each state point to the application of the other state's law.

move in limine for summary judgment regarding issues of Swiss law. Defendant has done so, and has submitted expert affidavits explaining various principles of Swiss law governing insurance contracts. Plaintiffs have not submitted any affidavits contradicting Defendant's experts, or are apparently content to rest on the argument that New York law should apply (which, as I have held, it does not). There are, therefore, no disputed issues of fact concerning what the Swiss substantive law governing insurance is, so there is no need for the Court to hear live testimony from the experts. I here set forth my findings concerning the principles of Swiss substantive law that will govern at trial.

Defendant also moves for summary judgment dismissing Plaintiffs' contract claims on the ground that Swiss law (as articulated by their experts) warrants judgment in their favor. This motion is denied as untimely. As I stated in my May 8, 2003 order, the time for making summary judgment motions in this case expired in 2001. For reasons that are inexplicable to the Court, Defendant did not make its motion for summary judgment on the contract claims (and the corresponding motion for a declaration of what Swiss substantive law is) in a timely manner. Since I cannot take the case to trial without determining what the law of Switzerland is, I have little choice but to decide Defendant's motion to the extent of determining what the law is. *See* F.R.C.P. 44.1. But, I need not, and do not, entertain their untimely motion for summary judgment on the merits. Defendant is free to renew its arguments on the inevitable motion for a directed verdict.

 I deny Defendant's motion to "exclude all evidence" relating to the contract claims for the same reason. In effect, this is a motion to dismiss the claims. In limine motions are generally not the appropriate vehicle for effecting dismissal. *See TVT Records, et al. v. Island Def Jam Music Group, et al.*, 250 F.Supp.2d 341, 344–345 (S.D.N.Y.2003).

### 1. *Swiss Law Concerning Dividends*

In support of the motion, La Suisse has offered an expert report from Professor Roland Schaer regarding the Swiss law applicable to dividend payments and recent opinions from the Swiss Appeals Commission for the Supervision of Private Insurance and the Federal Supreme Court in *Rosenberg v. FOPI*, in which the Swiss courts affirmed the propriety of La Suisse's decision to stop paying dividends. Plaintiff has not offered any evidence challenging Defendant's description of Swiss law.

Plaintiffs allege that Defendant breached its contract by failing to pay dividends throughout the terms of the policies. Dividends or surpluses tend to arise when the rates which had been set (based on certain assumptions of loss) turn out to have been set too high. As the Swiss Appeals Commission noted "since rate premiums represent a binding maximum price for, in some cases, extremely long-term insurance policies, they are as a rule based on cautious evaluations, and safety margins are built-in. A rather worse course of events is assumed than effectively occurs, and therefore surpluses regularly tend to accrue." (Olson Decl., Ex. I p. 7).[2] Defendant contends that under Swiss law dividend payments—which are calculated as a percentage of the profit generated from a particular policy group—are required only

---

**2.** Citations to page numbers in Swiss decisions is, in all cases, to the certified translation provided to this Court.

when an insurer is generating a profit on its policies in that group.

The Swiss insurance regime is closely regulated by the Swiss Federal Office of Private Insurance ("FOPI") and the National Bureau for Private Insurance which must review a company's business plan outlining the specifics of the policies and certify it as being valid before that company may accept insurance business. (Def. Mem., 4; Schaer Rpt., 3). An insurer cannot alter its business plan—or the conditions of insurance—without seeking prior approval from these authorities. (Schaer Rpt., 8). Section 19 of the General Conditions governing the policies at issue in this case provided that La Suisse would "fix, in accordance with the rules of its overall operations, the dividends" payable to policy holders. (Olson Decl., Ex. C). However, as a prerequisite to making any payments, La Suisse needed to obtain approval of its business plan from the supervisory authorities, and no changes could be made without once again gaining approval. (Schraer Rpt. at 3).

According to Prof. Schaer, the surplus arrangement, apart from being mentioned in the General Conditions, was a service provided by the insurer that was settled by the supervisory authority in connection with the business plan, and the content and scope of the surplus is an issue of public law. (*Id.* at 8–9).

Under Swiss law, insureds have an interest in any surpluses that the insurer realizes. Surpluses are assessed as a percentage of the profit from each profit or accounting unit, and these accounting units are created with the consent of the supervisory authorities. (*Id.* at 10). In this case, the relevant accounting pool is the Global E policy + marriage rider. (*Id.*) According to the Federal Supreme Court of Switzerland, "a right to payment of surplus shares exists if—regardless of the

reasons—surplus shares are actually earned." (*Rosenberg v. La Suisse,* Federal Supreme Court of Switzerland, opinion dated April 22, 2003, p. 10). The Federal Supreme Court further held that the issue is not whether the loss had already occurred on the date the decision to terminate dividends was made, but rather whether the decision to terminate was made after it became apparent that massive losses were "looming" because holding otherwise would force the insurer (and the supervising authorities) to knowingly put its solvency at stake. (*Id.* at 11).

If an insurer wants to cease making dividend payments it must petition FOPI and obtain approval to modify its business plan and must continue to obtain approval in each subsequent year. An insured may challenge an order from FOPI by filing a protest with the Federal Appeals Commission for the Supervision of Private Insurance. (Fed. Sup.Ct. *Rosenberg* decision dated Apr. 22, 2003 at 5.)

The Court will instruct the jury to apply Swiss law as outlined above. No rebuttal having been offered to Professor Schaer's affidavit, that is the law I will tell the jury to apply.

As previously noted I have denied La Suisse's motion for summary judgment on this issue as untimely. However, to further clarify the issues for trial, I note that La Suisse's suggestion that the *Rosenberg* case has preclusive effect—"or constitutes the law of Switzerland"—is unavailing, and evidence of La Suisse's loss must be presented at trial.

█ Generally, New York courts will give a foreign court decision no more preclusive effect than it would be accorded by the courts of the jurisdiction that rendered it. *Voreep v. Tarom Romanian Air Transport,* No. 96 Civ. 1384, 1999 WL 311811 at *4 (S.D.N.Y. May 18, 1999) cit-

ing *Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 275, 317 N.Y.S.2d 315, 318, 265 N.E.2d 739 (1970) (finding similar preclusive effect under French and U.S. law) and *Schoenbrod v. Siegler*, 20 N.Y.2d 403, 409, 283 N.Y.S.2d 881, 230 N.E.2d 638 (1967) (denying preclusive effect to a Mexican divorce decree where the party would have been permitted to collaterally attack the decree in the Mexican courts). Because Switzerland does not recognize the doctrine of collateral estoppel, (Decl. of Isabelle Romy in Opp. to Pls' Mot. for Summ. J. at 3–4), I cannot apply the doctrine to bar this aspect of Plaintiffs' claims. Furthermore, although Switzerland recognizes the doctrine of res judicata, or claim preclusion, this doctrine would not bar the claims, as there is no identity of parties on the Plaintiffs' side. *Parker v. Blauvelt Volunteer Fire Co., Inc.*, 93 N.Y.2d 343, 347, 690 N.Y.S.2d 478, 712 N.E.2d 647 (1999). Although Dr. Rosenberg may have been obtained as "Special European Counsel" (Olson Decl., Ex. H), he was not acting on the plaintiffs' behalf in *Rosenberg v. La Suisse*. La Suisse will benefit from the Swiss courts' clarification of the law, but must present sufficient evidence of economic loss at trial to defend against this claim.

### 2. *Swiss Law Concerning Pro–Rata Premium Refunds*

Defendant moves for summary judgment holding that Swiss statutory law precludes pro-rata premium refunds absent an express agreement to the contrary, and the policies at issue do not provide for refunds in the case of marriage. Plaintiffs challenge La Suisse's argument because the General Conditions are part of the "Global" insurance policy to which riders are attached, and as such does not reflect the terms of the riders. Plaintiffs offer no evidence of Swiss law in support of their claims. Rather, Plaintiffs argue "common sense" dictates that the marriage riders added another triggering event to the Global policy (a life insurance policy), and the rider added the marriage contingency which also requires pro-rata refunds be granted when it occurs.

In support of their contentions, La Suisse has offered the expert report of Professor Franz Werro who has described relevant Swiss law. (Olson Decl. Ex. A). Unlike the payment of dividends, there is no statutory basis for a pro-rata refund of premiums. In fact, Article 24 of the Insurance Contract Act states that even if the insurer has to cover the insured risk for only part of the contract term, the policyholder has to pay the full premium, unless otherwise provided for in the insurance contract or the Act itself. (*Id.*, 30). According to Professor Werro this is known as the principle of "indivisibility of premiums." The Act provides for certain statutory exceptions which are inapplicable in this case.[3] Therefore, Plaintiffs' right to recovery must be derived from the contract itself, which the Act recognizes as superceding the principle of indivisibility. (*Id.*) To circumvent the rule against pro-rata premium refunds, a contract must clearly provide for those refunds in unequivocal terms. (*Id.*) Any deviations from statutory rules are interpreted restrictively. (*Id.*)

Unless this claim is dismissed via directed verdict, I will instruct the jury to apply Swiss law as outline above.

### 3. *Swiss Law Concerning Interest Rates on Loans*

As with the dividends issue, La Suisse's policies regarding loans and interest rates

---

**3.** The statutory exceptions allow refunds if the contract is terminated prematurely because the insurer has lost its business or because bankruptcy proceedings are opened against the insurer. (*Id.*) .

have already been challenged in Swiss courts, and La Suisse has provided those decisions along with Professor Werro's testimony on Swiss laws governing loan interest rates to support its claim that § 15.2 is enforceable under Swiss law.

In *Padwa v. La Suisse,* a British citizen (living in Zurich so Swiss law was applied) who had purchased one of the marriage policies brought an action seeking to compel La Suisse to provide a loan for 6,000 SFr. at prevailing market interest rates rather than the 8% La Suisse offered. Plaintiff argued that La Suisse had a contractual obligation to provide the loan. (Olson Decl. Ex. L, 5). All facts in the case were undisputed and the court considered the case as a "pure" interpretation dispute. In that case, the disputed provision entitled "Policy Loans" provided in relevant part that "the maximum amount of the loan—which shall depend on the redemption value—and the loan interest rate shall be determined by 'La Suisse.' " (*Id.* at 3). The contract provision at issue in this case reads substantially the same way.[4] La Suisse argues that this decision proves that they are entitled to set interest rates in their sole discretion.

In *Padwa,* the District Court interpreted the contract in light of "general understandings of language" and found that "it is easily recognizable that [the provision] merely states that it is a matter for the Defendant to set the substantial loan conditions, namely, the maximum amount and the loan interest rate. . . . Specifically, it is quite plain that reference is never made to prevailing market customs or practices on which the defendant would have had to or should focus." (*Id.* at 11). The court further held that the fact that the loan would depend on the redemption value in-

dicated that policyholders could not expect to demand a loan in whatever amount they might wish, and Plaintiff's claim was dismissed. (*Id.*) This decision was later upheld by the Highest Court of the Canton of Zurich and the Swiss Federal Supreme Court. (*Id.,* Ex. M, N).

In addition to the *Padwa* case, La Suisse has offered Professor Werro's testimony. According to Professor Werro, Swiss contract law provides for comprehensive freedom of contract, and, subject to certain limitations, allows parties to a contract to agree freely on the extent of their mutual obligations. (Olson Decl., Ex. A, 22) Thus, he argues the principles of contract outlined in § 15.2 of the General Conditions would permit La Suisse to charge any interest rate it determined provided it did not run afoul of certain statutory restrictions.

The first restriction identified by Professor Werro as a possible bar to La Suisse's ability to fix rates is the statutory prohibition on certain excessive interest rates. According to Professor Werro, a rate of 8% is within the realm provided for in the Swiss Convention, which limits the permissible rates for loan agreements to 12%. (*Id.,* Ex. A., 23). Professor Werro further notes that, although case law on the subject of permissible interest rates is rare (because those rates are governed by the Convention), the Federal Court has upheld an interest rate as high as 18%, far in excess of the 8% at issue in this case. (*Id.* at 24). However, Professor Werro acknowledges a third potential challenge to loan interest rates—Article 21 of the Swiss Code of Obligations—which may be applicable in this case.

---

4. Section 15.2 of the General Conditions entitled "Policy Loans" provides that "the maximum amount of the loan—which depends on the surrender value—and the rate of interest to be charged shall be fixed by BLa SuisseH." (Olson Decl. Ex. C).

Article 21 prohibits the "excessive disparity of mutual obligations in a contract," and is applicable if three criteria are met: 1) there is a gross disparity in the value of services or goods promised under the contract; 2) the party bound by the excessive obligation must have been in a situation of economic distress, inexperience or improvidence; and 3) the other party exploited this weakness to bring about the conclusion of the contract. (*Id.*). Professor Werro asserts that none of these conditions has been met; however, the applicability of this provision raises a factual issue which is appropriately determined by a jury.

I will instruct the jury to apply Swiss law as outlined by Professor Werro without opposition from Plaintiffs.

### 4. *Swiss Law Concerning Premium Payment Credits*

According to Professor Werro, under Article 92 of the Swiss Code of Obligations, a policy holder whose tender of payment is improperly rejected can discharge its obligations by depositing the money owed and requesting a competent court at the place of deposit to indicate an appropriate deposit. (*Id.* at 29). La Suisse maintains that Plaintiffs' failure to take these steps meant that the policyholders remained in debt regardless of the propriety of La Suisse's act in returning the payments to Bituswiss, which it believed acted as an agent for Plaintiffs.

The jury will be instructed regarding the requirements of Article 92 of the Swiss Code of Obligations.

### C. *Evidence Regarding Non–Similarly Situated Groups*

In considering Defendant's Motion for Summary Judgment in *Weiss VI*, I held that Plaintiffs had not offered sufficient evidence from which a jury could infer that La Suisse discriminated against Plaintiffs by treating other non-minority, similarly situated policy holders differently. *Weiss*, 260 F.Supp.2d at 654–656. Having reviewed the record submitted in opposition to the motion, I found that there was a "complete absence of any evidence of similarity" between the Plaintiffs and other policy holders who did not have a marriage rider in their contracts. *Id.* at 656. Therefore, Plaintiffs had not shown that La Suisse had allowed for pro-rata refunds of premiums or paid dividends on non-marriage policies to similarly situated persons who were not Jewish.

In light of this decision, La Suisse now seeks to exclude all evidence regarding alleged preferential treatment of non-minority policyholders. For the following reasons, La Suisse's motion is granted in part and denied in part.

The purpose of a motion in limine is to allow the trial court to rule in advance on the admissibility and relevance of certain forecasted evidence. *Wechsler v. Hunt Health Systems, Ltd.*, No. 94 Civ. 8294, 2003 WL 22358807 at *1 (S.D.N.Y. Oct. 16, 2003), citing *Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). A motion in limine may properly be denied where it is too sweeping in scope. *Baxter Diagnostics, Inc. v. Novatek Medical, Inc.*, No. 94 Civ. 5220, 1998 WL 665138 at *3 (S.D.N.Y. Sept. 25, 1998) (denying motions in limine seeking to "exclude all evidence of plaintiff's financial condition" and preclude plaintiff from presenting evidence on its punitive damages claim), citing *National Union Fire Ins. Co. v. L.E. Myers Co. Group*, 937 F.Supp. 276, 287 (S.D.N.Y. 1996). Here, Defendant's motion to dismiss all evidence regarding other policy holders, lacks sufficient specificity with respect to the evidence to be excluded. *Id.*

No particular documents or testimony have been identified in this motion.

■ Furthermore, evidence should not be excluded on a motion in limine unless such evidence is clearly inadmissible on all possible grounds. *Rmed International, Inc. v. Sloan's Supermarkets, Inc.*, No. 94CIV.5587, 2002 WL 31780188, at *1 (S.D.N.Y. Dec. 11, 2002). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid 401. "In the absence of context the court cannot categorically conclude that such evidence is not related to matters raised by the present dispute nor can it weigh its probity." *TVT Records*, 250 F.Supp.2d at 345.

■ Plaintiffs will not be entitled to introduce evidence related to non-similarly situated groups to raise an inference of discrimination, nor will they be allowed to make comparative statements in their opening or summation in an effort to demonstrate that La Suisse discriminated against them. Plaintiffs were obligated to introduce their evidence on this point in response to Defendant's Motion for Summary Judgment. "A plaintiff opposing a motion for summary judgment must lay bare his proof in evidentiary form and raise an issue of fact sufficient to send to the jury." *McGovern v. Local 456, Intern. Broth. of Teamsters, Chauffeurs & Warehousemen & Helpers of America, AFL–CIO*, 107 F.Supp.2d 311, 320 (S.D.N.Y. 2003); *see also, Covington v. City of New York*, No. 94 Civ. 4234, 1998 WL 226183 at *3 (S.D.N.Y. May 4, 1998) (same). A party cannot withhold evidence in his possession when his opponent makes a motion for summary judgment and then introduce the missing evidence at trial. *See In re Food Fair, Inc.*, 14 B.R. 46, 48 (Bkrtcy.S.D.N.Y. 1981) ("in opposing a motion for summary judgment a party, cannot withhold evidence until the date of trial, but must show by some admissible evidence that there is a genuine issue as to a material fact"). When I decided the Defendant's summary judgment motion, I held that because Plaintiffs had adduced no evidence about similarly situated persons, it had raised no disputed issue of material fact on this particular theory. *Weiss VI*, 260 F.Supp.2d at 654–656. That means Plaintiffs have forfeited the right to take the case to trial on that theory.

The only issues that remain for trial are 1) Plaintiffs' contract claims and 2) on their discrimination claim, their allegation that La Suisse's proffered non-discriminatory reason for its actions—i.e., that the policies were not profitable—is a pretext. These are very narrow issues. Whatever evidence is relevant to these remaining claims will be admitted. The Court will consider any objections from Defendant regarding specific items of evidence as they arise.

### D. *Currency Conversions for Damages*

■ In the event that damages are awarded, La Suisse argues that any damages be converted from Swiss Francs to U.S. dollars [5] at the exchange rate pending on the date of judgment. Plaintiffs did not contest this portion of La Suisse's motion in limine, although it has previously asked the court to use the exchange rate in effect on the day of the breach.

La Suisse's motion is granted. As a Federal Court sitting in diversity, I must apply the currency conversion rule em-

---

**5.** Section 27.1 of the General Conditions states that benefits are to be paid in Swiss francs, and the parties have assumed any judgment will initially be entered in terms of Swiss francs.

ployed by the courts of New York. *See Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 865 (2d Cir.1981). New York courts have adopted the "judgment day" rule, which mandates conversion based on the exchange rates as of the date of judgment. New York Judiciary Rule § 27(b) provides:

In any case in which the cause of action is based upon an obligation denominated in a currency other than currency of the United States, a court shall render or enter a judgment or decree in the foreign currency of the underlying obligation. Such judgment or decree shall be converted into currency of the United States at the rate of exchange prevailing on the date of entry of the judgment or decree.

(N.Y. Judiciary Law § 27(b)(McKinney, 2001).) In accordance with the laws of New York, any judgment entered in Plaintiffs' favor will be converted from Swiss francs to U.S. dollars at the prevailing exchange rate as of the date of judgment.

## III. Plaintiffs' December 2001 Motion in Limine [6]

### A. *Evidence regarding Defendant's Dismissed Counter-claims*

In *Weiss IV,* I granted Plaintiffs' motion for summary judgment on La Suisse's counterclaim for fraud. In light of that decision, Plaintiffs move to preclude La Suisse from offering any evidence related to the dismissed counterclaim for fraud. Plaintiffs' motion is denied in part and granted in part.

In *Weiss IV,* I held that La Suisse could not impute any alleged fraud on the part of Bituswiss or Horowitz to the Plaintiffs. I granted judgment in favor of the Plaintiffs

on the grounds that Defendant's fraud claim was time-barred, and found that, even if it was not time-barred, dismissal was required because Defendant had offered no evidence linking Plaintiffs to any fraud. Therefore, La Suisse may not now imply that Plaintiffs defrauded La Suisse nor will Plaintiffs be held liable for any alleged fraud.

However, *Weiss IV* should not be read to deprive Defendant of its defense, which is that it stopped paying on the policies, and added administrative requirements, because they were unprofitable. Plaintiffs' allege that La Suisse's explanations for its conduct toward Plaintiffs are merely pretextual and the real reason for its actions was discrimination, specifically on the ground that Plaintiffs are Jewish. Defendant's understanding and view of the circumstances surrounding the sale of the marriage policies—including its belief that certain brokers may have defrauded the company—is relevant to its defense that it took the actions it did for non-discriminatory reasons.

Exclusion of relevant information is "an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.,* 914 F.2d 26, 31 (2d Cir.1990). Evidence—including meeting minutes—offered to demonstrate La Suisse's explanation of a possible fraud is critical to La Suisse's defense that certain actions were taken against policy holders for a non-discriminatory purpose and will therefore be admitted. *See Meiri v. Dacon,* 759 F.2d 989, 997 n. 13 (2d Cir.1985) ("The reasonableness of the employer's reasons for discharge is, of course, probative of the question whether they are pretexts."); *cf. Rmed International, Inc. v. Sloans Supermarkets, Inc.,* No. 94 Civ. 5587, 2002 WL 31780188 at *1

---

6. Plaintiffs' request for a Rule 44.1 hearing is moot in light of above decision and later-filed briefs.

(evidence should not be excluded on a motion in limine unless such evidence is clearly inadmissible on all grounds). Whether or not Defendant was actually defrauded does not change this determination. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir.2001) ("Whether or not fraud actually occurred, questionable circumstances surrounding an employee's claim for benefits provide a nondiscriminatory reason for choosing to terminate that employee over others when economic reasons force the employer to make such a choice"). To the extent Plaintiffs are concerned that this evidence will be confusing or suggest they were involved in fraud, the Court will give a special limiting instruction to the jury.

B. *Evidence of La Suisse's loss on Marriage Policies*

■■■ Plaintiffs move to preclude La Suisse from producing evidence related to monetary loss on its marriage portfolio on the grounds that such evidence was not produced in discovery. Specifically, Plaintiffs object to DX 606–644, which relate to La Suisse's profits and losses on the marriage policies.[7] Plaintiffs argue that because Defendant's counsel had previously stated that "such information" did not exist or was not "separated out" by La Suisse, they cannot now offer this evidence to the jury.

La Suisse disputes this characterization of its prior position. La Suisse points to the fact that information regarding losses was available from the corporate minutes—which were produced and appear on both Plaintiffs' and Defendant's exhibit lists—and could be easily calculated by comparing the benefits paid to the premiums received—facts which are undisputed—or from applying other formulae. (Def. Mem. In Opp., 9). Moreover, La Suisse points out that Plaintiffs declined to depose Christian Klausenberg, who will testify regarding La Suisse's loss projections, despite receiving a copy of his report which concluded that "overall losses can reasonably be extrapolated from statistical data and demonstrates total projected losses for the entire [marriage policy] portfolio of approximately CHF 350 million." (*Id.* at 10).

Evidence regarding any losses La Suisse suffered on its marriage policies is relevant both to its claim that its treatment of Plaintiffs was motivated by non-discriminatory considerations and to its claim that Plaintiffs are not entitled to dividends under Swiss law. As Defendant argues, evidence regarding La Suisse's projected losses has been readily available to Plaintiffs and the fact that Defendant did not have a profit and loss statement specifically for the marriage policies "separated out" does not preclude them from offering evidence regarding projections. Plaintiffs' motion to exclude is denied.

IV. **Defendant's December 2001 Motion in Limine**

A. *Testimony of Dr. Beryz Rosenberg*

■■■ La Suisse moves to preclude Dr. Beryz Rosenberg from testifying on Plaintiffs behalf on the grounds that Dr. Rosenberg failed to comply with a properly issued subpoena and Magistrate Judge Fox's order to comply with said subpoena.

---

7. Copies of these exhibits have not been provided to the Court and only the descriptions of the documents as given in the Joint Pre-Trial Order were reviewed. Exhibits 606–629 and 635–642 appear to be various payment orders and bank records demonstrating payment to Plaintiffs; 630–641 are the relevant expert reports from Defendant's Swiss law and economic experts, and; 643–644 are both demonstrative exhibits regarding capital paid out to policyholders.

Dr. Rosenberg is a Swiss lawyer who served as a principal of Bituswiss during the years when La Suisse first began selling marriage policies. (Pl. Mem. in Opp., 3). Although Plaintiffs dispute La Suisse's characterization of their relationship with Dr. Rosenberg, and claim to have no "control" over him, Plaintiffs described him to this Court as having been "retained as special European counsel in this case." (Pl. Letter Brief dated Oct. 27, 2000, attached as Olson Decl., Ex. B). Recognizing that Dr. Rosenberg might have critical information to this case, Defendant served Dr. Rosenberg with a subpoena when he voluntarily appeared for a deposition in January 2001. Defendant claims—and Plaintiffs do not dispute—that Dr. Rosenberg has not complied with this subpoena and has failed to produce any documents.

In opposition to the motion, Plaintiffs argue that the subpoena was related to the dismissed fraud counterclaim. They argue that, because that claim was dismissed (almost four months after a May 7, 2001 hearing in which Judge Fox issued an order) and because Bituswiss provided all documents to Defendant which Rosenberg might have, he should be permitted to testify and the harsh sanction of preclusion is inappropriate.

I reject the argument that the subpoena related solely to the time-barred fraud claim. The subpoena—provided to the court with Defendant's reply brief—clearly calls for all documents related to the marriage policies and plaintiffs and is not limited to documents related to the dismissed claims. (*See* Def. Reply Mem., Ex. A).

In the May 7, 2001 hearing, Judge Fox informed the parties that if Plaintiffs failed to move to quash the subpoena and Rosenberg was "validly served, then the subpoena has effected [sic] the case and [Rosenberg] is not going to be permitted, nor would I permit any witness within my authority to be called by a party when that witness has refused to provide discovery." (Olson Decl., Ex. C). I agree. Rule 37 of the Federal Rules of Civil Procedure authorizes courts to sanction parties for failure to comply with discovery requirements. F.R.C.P. 37(b)(2)(B). Preclusion is "a harsh remedy, 'justified ... when the failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable.'" *Hart v. Westchester County Dept. of Social Services,* 160 F.Supp.2d 570, 579 (S.D.N.Y.2001), quoting *Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1365 (2d Cir.1991); *see also John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988) (dismissal under Rule 37 is justified where party "fails to comply with the court's discovery orders willfully, in bad faith, or through fault"). In this case, where the parties have been duly warned and still fail to provide the information subpoenaed, the sanction is warranted.

Plaintiffs assertion that Defendant already received documents from Bituswiss cannot excuse Dr. Rosenberg's failure to comply with the subpoena. As Judge Fox already warned Plaintiffs "that's not the way it works ... Because a party has the opportunity in litigation to request information from more than one entity and more than one individual, obviously, in order to compare the two." (Tr. May 7, 2003 Status Conf. 9:11–23). Defendant should not be denied this benefit if there are in fact other documents.

Defendant's motion to preclude testimony from Dr. Rosenberg is granted.

B. *Evidence of 1996 Administration Rule Changes Applicable to Brokers*

The portion of Defendant's motion that seeks to preclude introduction of evidence about the administrative rule

changes for brokers handling marriage policies is denied. The 1996 rule changes are relevant to Plaintiffs' contract claims and the Defendant's decision to reject certain premium payments. The rules are therefore admissible. However, Plaintiffs may not use this evidence to show that they were treated differently from other policy holders, and will not be permitted to make statements—as they have in their brief—that "no other policies sold by La Suisse suffered similar restrictions." (Pl. Mem. in Opp., 5). The time for introducing evidence that "similarly situated" policy holders were treated differently was in opposition to the motion for summary judgment, as noted above. There, Plaintiffs failed to adduce evidence that the holder of other policies were similarly situated as the law understands that term. *Weiss*, 260 F.Supp.2d at 655.[8]

### C. *Parol Evidence Regarding Claims for Pro-rata Refund*

 Defendant seeks to exclude parol evidence regarding the availability of pro-rata premium refunds. The motion is granted.

Neither party has provided information regarding the applicability of a parol evidence rule under Swiss law. However, Defendant asserts that, under Swiss law, no representations made by a broker or extrinsic evidence can alter the terms of a written agreement. According to Professor Werro, Article 34 II of the Insurance Contract Act provides that "the agent is not authorized to deviate from the general insurance conditions, neither in favor nor in disfavor of the policyholder." (Werro Rpt., 32).

Again, Plaintiffs' have not submitted any evidence to suggest that this description of Swiss law is inaccurate. In opposition to Defendant's motion, Plaintiffs' simply assert—without providing any supporting law—that the issue of whether pro-rata refunds are due is an issue of fact or a mixed question of fact or law. Whether or not that is actually the case does not affect the issue of whether parol evidence is admissible to prove the claims.

In light of Professor Werro's unopposed testimony about the statutory prohibition on broker's changing policies, I find that, under Swiss law, no extrinsic evidence ought to be admitted.

 If considered under New York's parol evidence rule, the result would be the same. "In order to apply the parol evidence rule, this Court must employ a three-step inquiry: (1) determine whether the written contract is an integrated agreement; (2) if it is, determine whether the language of the written contract is clear or is ambiguous; and, (3) if the language is clear, apply that clear language." *Municipal Capital Appreciation Partners, I, L.P. v. Page,* 181 F.Supp.2d 379, 392 (S.D.N.Y.2002). "[U]nder New York law, a contract which appears complete on its face is an integrated agreement as a matter of law." *Id.* quoting *Battery Steamship Corp. v. Refineria Panama, S. A.,* 513 F.2d 735, 738 n. 3 (2d Cir.1975) (citing *Higgs v. De Maziroff,* 263 N.Y. 473, 478, 189 N.E. 555, 557 (1934)).

In this case, the parties have stipulated that the terms of the marriage policies are contained in the 1996 General Conditions and marriage rider. (Joint Pre–Trial Order, ¶ 15). Neither party has suggested that this is not the entire agreement, and I therefore conclude that the contract is an integrated agreement (as is the case with insurance policies in the U.S.).

---

**8.** I note that these in limine motions were made contemporaneously with the motion for summary judgment.

The second step requires the Court to determine if the contract is clear or ambiguous. Extrinsic evidence is inadmissible to vary the terms of an unambiguous contract which purports to express the parties' entire agreement. *Furey v. Guardian Life Ins. Co.*, 261 A.D.2d 355, 689 N.Y.S.2d 208 (2d Dep't.1999) (citing *Braten v. Bankers Trust Co.*, 60 N.Y.2d 155, 468 N.Y.S.2d 861, 456 N.E.2d 802 (1983)) (Plaintiff precluded from providing extrinsic evidence regarding the availability of dividend payments under an insurance agreement). "An ambiguity arises if the terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Municipal Capital Appreciation Partners*, 181 F. Supp.2d at 393. (internal citations and quotations omitted).

Section 22 of the General Conditions covers "Payment of Premiums" and provides in relevant part that "BLa SuisseH will refund to the beneficiary any part of the periodic premiums not used at the end of the insurance month during which the insured died." (Olson Decl., Ex. C). There is no ambiguity in this provision. The provision clearly allows for the payment of refunds in the case of death. The fact that there is no mention of marriage or other contingencies does not make the provision ambiguous. Therefore, no extrinsic evidence will be admissible regarding the availability of pro-rata refunds in the event of marriage.

D. *Evidence of Reinsurance Purchased by Defendant*

I reserve decision on that portion of Defendant's motion that seeks to preclude any evidence regarding reinsurance purchased by Defendant.

Rule 411 provides "evidence of whether a person was . . . insured against liability is not admissible upon the issue whether the person acted negligently or wrongfully." However, Rule 411 is not a bar to the introduction of evidence regarding liability insurance in all cases. The rule specifically allows for evidence to be introduced to show ownership, control or bias, and courts have allowed evidence of insurance in cases where the insured opens the door to the issue by "poor mouthing" or where the party's ability to pay damages has been put into issue. *See Bernier v. Board of County Road Com'rs for Ionia County*, 581 F.Supp. 71, 78 (W.D.Mich. 1983); *DSC Communications Corp. v. Next Level Communications*, 929 F.Supp. 239, 248 (E.D.Tx.1996) (holding defense counsel opened door to admissibility of evidence regarding indemnification where implied the case was matter of "life and death" to defendants); Wright & Miller, Federal Prac. & Proc. § 5368 (Plaintiffs have sometimes been allowed to show the existence of insurance in response to "poor-mouthing" by defendants)(citing cases).

*Bernier* is instructive in this case. In *Bernier*, Plaintiffs sued the municipality for wrongful death on the grounds that the municipality had failed to mark the intersection where the accident occurred. In order to undermine the municipality's contention that it had limited resources and needed to focus on those intersections in most need of repair, plaintiffs sought to introduce evidence of the municipality's liability insurance. The court decided to reserve judgment until the close of defendant's case because it was not persuaded that this proposed defense opened the door

to the issue of liability insurance. *Bernier,* 581 F.Supp. at 78. The Court also cautioned that "defendant should keep in mind, however, that should the nature of defendant's proofs be such that the jury might infer defendant's inability to pay a judgment, evidence that defendant has liability insurance may become admissible as an exception to the general prohibition of insurance evidence contained in Fed. R.Evid. 411." *Id.*

In this case, the success of Plaintiffs' claims will turn on the reasonableness of Defendant's claim that its actions were motivated by financial concerns rather than discriminatory considerations. Evidence that Defendant had insurance to cover the losses may well be directly relevant to whether or not Defendant's proffered defense to claims that they discriminated against Jewish policy holders was a pretext or not. I will rule on this motion at the close of Defendant's case. If I do allow evidence of reinsurance, I will give the jury an appropriate limiting instruction.

### E. *Evidence Regarding "Operation Tell"*

■ Defendant also seeks to preclude Plaintiffs from offering any evidence about "Operation Tell", on the grounds that such evidence is irrelevant, misleading and highly prejudicial under F.R.E. 401–403. According to Defendant, Operation Tell was the code name used by La Suisse's parent company, Rentenanstalt, in reference to a highly confidential plan to "demutualize the company and offer shares of Rentenanstalt to the public on the Swiss stock exchange," and the issue did not directly concern La Suisse. (Def. Mem. at 15). Plaintiffs have not opposed this aspect of Defendant's motion, and I can see

no reason why such evidence is relevant to the issues in this case. That portion of Defendant's motion that seeks to preclude evidence about "Operation Tell" is granted.

### F. *Evidence Regarding Defendant's Corporate Parent*

■ Defendant also moves to preclude evidence about its corporate parent. Because Plaintiffs have not objected to this portion of Defendant's motion and I have already held that Rentenanstalt has no connection to Plaintiffs' claims, this portion of Defendant's motion is granted. Evidence regarding Rentenanstalt's financial condition or structure will be excluded except to the extent such information is necessary to an understanding of the reinsurance agreements that La Suisse obtained to cover the loss on the marriage portfolio should such evidence be admitted. (See above).

### G. *Witnesses Not Listed in Plaintiffs' Interrogatory Responses*

■ La Suisse seeks to preclude Plaintiffs from calling seven witnesses at trial on the grounds that those witnesses were not identified in Plaintiffs' interrogatory responses as being individuals who had knowledge of the case. Defendant has objected to: Philippe Maeder, Louis Gillieron, F. Guisan, David Weiss, Abraham Posen, Daniel Nordamm and Blaise Grivel.[9]

■ In determining whether preclusion is an appropriate remedy, courts consider four key factors: (1) the party's explanation for failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet

---

**9.** Plaintiffs have not opposed Defendant's motion to preclude David Weiss, Abraham Posen or Daniel Nordmann. Therefore, those witnesses will be stricken from the pre-trial order and will not be permitted to testify.

the new testimony; and (4) the possibility of a continuance. *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.R.D. 151, 159 (S.D.N.Y.2003). In this case, these factors cut in favor of allowing the testimony.

First, Plaintiffs argue they were unaware of the identity of these individuals until January 2001, when they deposed Defendant's witnesses. Second, the witnesses in dispute are all former employees of La Suisse. According to Plaintiffs, they administered the marriage policies for La Suisse. If Plaintiffs' contentions are correct, then these witnesses may have valuable testimony which should be heard. To the extent that Defendant is concerned that it will be prejudiced if these witnesses are allowed to testify because Defendant has not deposed the witnesses, that is Defendant's problem. It knew which of its employees or former employees worked on the policies and it was in the best position to identify them early on and look into their stories. I see little evidence of prejudice when the witnesses are former La Suisse employees whom La Suisse would have known had relevant information about the case.[10]

Defendant's suggestion that Plaintiffs have violated a direct order from Judge Fox is not persuasive. In a December 2000 status conference, Defendant objected to Plaintiffs' late designation of certain sub-brokers as witnesses. Judge Fox ordered Plaintiffs to provide contact information for the sub-brokers within three days and warned that Plaintiffs' failure to identify witnesses it knew about was "borderline sanctionable." The situation before me is different. Unlike the brokers, who were known to Plaintiffs and not identified, Plaintiffs had no way of knowing about

these former La Suisse employees until discovery occurred. Defendant certainly cannot claim that it did not know about these witnesses. La Suisse is merely surprised that Plaintiffs have decided to call them. That portion of Defendant's motion which seeks to preclude its former employees from testifying is denied.

## V. Conclusion

Defendant's May 22, 2003 Motion in Limine is granted in part and denied in part. Plaintiffs' December 3, 2001 Motion in Limine is granted in part and denied in part. Defendant's December 3, 2001 Motion in Limine is granted in part and denied in part.

This constitutes the decision and order of the Court.

---

**10.** Assuming Plaintiffs included an interrogatory similar to Defendant's which requested information regarding any persons with knowledge relevant to the litigation, it would seem that Defendant should have identified these people, and if they had, any surprise would have been avoided.